MRS. CARRIE BISHOP, Plaintiff in Error, v. V. F. BOTTO, Defendant in Error.

and

HENRY BISHOP, Plaintiff in Error, v. V. F. BOTTO, Defendant in Error.

Western Section.   December 19, 1932.

Petition for Certiorari denied by Supreme Court, May 20, 1933.

Joe H. Norville and P. J. Lyons, of Memphis, for plaintiff in error.
Bates, Shea & Frazier, of Memphis, for defendant in error.

SENTER, J. The parties will be referred to as in the court below, Mrs. Carrie Bishop, plaintiff, and V. F. Botto, defendant; Henry Bishop, plaintiff, and V. F. Botto, defendant.

Henry Bishop is the son of Mrs. Carrie Bishop, and lived with her where she occupied a part of the house known as 678 Poplar Avenue, in Memphis, as the tenant.

The declaration alleges in substance that they were both seriously injured as the result of an explosion. We quote from the portion of the declaration of Henry Bishop which sets forth the cause of action, and is substantially the same as set forth in the declaration of Mrs. Carrie Bishop: "Plaintiff alleges that the explosion and resultant injury to him were proximately caused by the negligence of the defendant, and that the defendant was negligent in this: That the defendant negligently caused and allowed an old cistern to be and remain under the house, a portion of which house was rented to the plaintiff's mother; that the defendant negligently permitted such cistern to be unfilled and negligently permitted gas and other refuse to be collected in said cistern, which said refuse generated gas, which said gases were confined and when ignited would explode with great force and violence. That the defendant negligently failed to fill the said cistern, but on the contrary, covered the same defectively and dangerously, making a condition which would cause the said inflammable gases to explode with terrific force if ignited; that the defendant negligently rented the said premises, well knowing that the said dangerous condition existed, and negligently failed to notify and warn the plaintiff of said dangerous condition."

The two cases were tried before the same jury on the same facts and at the same time by consent of parties. The defendant filed pleas of not guilty to both declarations.

At the conclusion of plaintiff's evidence the defendant moved the court for a directed verdict in his favor. This motion was sustained by the court, and the jury directed to return a verdict in favor of defendant in both cases. Both plaintiffs filed motions for a new trial, which were overruled and disallowed, and judgments entered in favor of the defendant for the costs in both cases. To the action of the court in overruling the respective motions for new trials, and in dismissing their suits, both plaintiffs have appealed to this court in the nature of a writ of error, and have assigned errors.

It appears from the record that plaintiff, Mrs. Carrie Bishop, rented a portion of the house where the explosion occurred in March, 1931. It does not appear that she paid the rent to defendant Botto, and one of the questions made by appellee is that there was no evidence to show that defendant Botto was the owner of the premises, or that he rented the premises to plaintiff. Two deeds were introduced in evidence by plaintiff conveying certain lots to defendant Botto, and while plaintiff failed to introduce evidence to show that

the house in question was actually located on either of the lots covered by the deeds introduced, the attorney for plaintiff at the time the deeds were introduced and put in evidence stated that the deeds covered the premises where the explosion occurred; it was also shown that on one occasion a driver of a truck bearing Botto's name on the truck called to collect the rent, and Mrs. Carrie Bishop testified that she rented from and paid the rent to a Mrs. Watson. She only rented a portion of the house. However, before the trial of the case was taken up, or rather before the introduction of any evidence, the attorneys for the respective parties made statements to the court and jury and wherein Mr. Frazier, the attorney for defendant Botto, stated:

"May it please your Honor, the defendant's proof we think will show this; that there was no explosion from the cistern there; furthermore, that Mr. Botto, if there was an explosion at any time, of course, there really was something that happened there, that Mr. Botto had nothing whatever to do with it, and he was not negligent in the slightest extent; that neither his actions or lack of action caused, as a direct cause, or as a remote cause, this explosion which took place, and that the explosion did not occur as the result of any cistern gas, or as the result of the cistern being there, and the defendant pleads not guilty, and denies the allegation of the plaintiff's petition."

It will be observed that in making this statement to the Court the attorney for defendant did not deny that his client was the owner of the premises; nor is there the slightest suggestion contained in the statement by the attorney for defendant that Botto disclaimed ownership. This statement taken in connection with other circumstances, and the deeds in question would warrant the inference that Botto was the owner of the premises. This seemed to have been taken for granted by all the parties. It is very probable that Mrs. Watson rented the building and sub-rented a part of it to Mrs. Carrie Bishop.

Under the assignments of error it is earnestly insisted that there was evidence that would warrant the conclusion or inference that the explosion resulted from the formation of gases in an old cistern that was under the house, and that this cistern, which had been covered over with concrete and dirt on top of the concrete, had an accumulation of water and rubbish on the bottom, and that the explosion of the gas in the cistern was caused by the throwing of an axe under the house, causing a spark to ignite the gas confined in the cistern, and that the facts as shown by plaintiff's proof entitled the case to be submitted to the jury.

The facts with reference to the explosion may be briefly stated as follows: Plaintiffs moved into a portion of the double tenement house on March 8, 1931, and on the morning of July 13, 1931, while Mrs. Bishop and her son, Henry, were in the room used as a kitchen, an

explosion occurred from under the house. The force of the explosion tore up a considerable portion of the kitchen floor and injured both plaintiffs. After the explosion an investigation disclosed that there was an old cistern under the house and almost directly under the kitchen. This old cistern had at some time been covered over with brick and concrete cement, and dirt over the covering, and had the appearance of an uneven surface under the house, something like a small mound of dirt. The existence of this cistern was not known to plaintiff until the explosion occurred. After the explosion it was discovered that a small hole had been blown or torn in the brick and concrete cover to the cistern. This hole was about seven or eight inches in circumference. It had the appearance of having been freshly made; the brick were shorn or broken off, showing a fresh break. There was some water or moisture in the bottom of the cistern and some accumulation of trash. Shortly before the explosion occurred, Simon Hout was cleaning off leaves from the yard and picked up an axe that had been left in the yard, and put the same under the house, or threw the same under the house, and after a lapse of about four or five seconds, according to Hout's statement, the explosion occurred. It is the theory of plaintiffs that sewer gas, or some form of gas, which had generated in the cistern exploded, blowing the hole in the cistern top or covering and blowing up the floor of the kitchen; that the explosion was caused by the metal of the axe being thrown against the concrete covering causing a spark which ignited the confined gas, causing it to explode.

Mr. Buckalew testified that he was a fire marshal in Memphis, and in response to a call went to the premises soon after the explosion and made an investigation. He testified in substance that he found the kitchen floor torn up and that he found the small hole freshly made in the covering to an old cistern under the house. The hole in the cistern top, or cover, was about seven inches; that by using his flashlight he could discover that there was some water in the cistern, but could not tell how much; that there was some trash or floating chips, and probably tin cans in the bottom of the cistern; that the cistern was from nine to eleven feet deep. He also testified that a form of gas would at times accumulate in such places, and under certain conditions would explode. He also testified that the explosion could have occurred from other causes. On cross-examination he stated that he also found under the house some paint cans, and testified that under proper conditions that an explosion could result from the paint cans. He also testified that an explosion could result from dust accumulation; or from dynamite. The witness stated that he could not state the cause of the explosion, or whether the explosion was from gas in the cistern. He only testified as to his theory.

Assuming for the purposes that there was some evidence to support

plaintiff's theory that the explosion resulted from the accumulation of some type of gas in the old and disused cistern; there is no evidence in the record to warrant the conclusion or even an inference that the defendant who had only owned the building for about fifteen years, ever had any knowledge that there had at one time been a cistern covered over with concrete, brick and dirt. It clearly appears from plaintiff's proof that there was nothing visible to indicate that there was a closed up cistern under the house. There was a small mound of dirt which had the appearance of an uneven place on the surface of the ground under the house. Plaintiff did not offer any evidence to show that the defendant ever had any knowledge of the existence of the old cistern, or that there had ever been a cistern which had been sealed up with concrete and brick under the house. If there was a dangerous condition present, it was clearly a latent and not an exposed defect or dangerous condition. A landlord does not impliedly warrant the premises to be safe, yet he will be liable for all injuries resulting to the tenant from latent defects in the premises of which he had knowledge and which were concealed from the tenant. (36 C. J., page 206, Sec. 877; Dyer v. Robinson, 110 Fed., 99.)

A landlord is liable to his tenant for an injury resulting from unsafe or dangerous conditions of the leased premises existing at the date of the lease, if the landlord, by the exercise of reasonable care and diligence, should have known of the condition and failed to disclose it to the tenant. (Wilcox v. Hines, 100 Tenn., 538, 46 S. W., 297; Sternberg v. Wilcox, 96 Tenn., 163, 33 S. W., 917; Schmalzried v. White, 97 Tenn., 39, 36 S. W., 393.)

In the present case there is not a scintilla of evidence that the defendant had actual knowledge of the existence of this cistern. There was nothing in the physical appearance of the ground under the house that would indicate that there was a cistern underneath. Hence there is nothing in the facts as disclosed by the record that would indicate that the defendant had been guilty of any negligence in not discovering the existence of this cistern under the house. It had every appearance of being simply "an uneven place" under the house and had the appearance of being a small mound of dirt left under the house. To have discovered the existence of this cistern the defendant would have to have gone under the house and dug about in the dirt. Reasonable care and diligence to discover such a defect, where there had been no knowledge upon the part of the defendant of the presence of the cistern, would not require that he go under the house and dig about in the dirt in an effort to discover something that he did not know existed. We know of no rule of diligence that would require this of the defendant. In the absence of any proof of actual knowledge or of implied knowledge upon the part of defendant of the existence of this cistern, and the facts not

warranting a conclusion that the exercise of ordinary diligence would have discovered its presence, there could have been no liability, and hence, it was a proper case for a directed verdict in favor of the defendant.

However, in the present case any verdict that the jury could have rendered fixing the cause of the explosion would have been speculative, and arrived at only by predicating one inference upon another. While a fact may be proven by circumstances as well as by direct evidence, yet the circumstances must be so cogent and direct as to exclude every other reasonable explanation. The nearest approach to any evidence that would warrant the inference that this explosion was the result of the accumulation of gases in the cistern, which in some way had become ignited, is the evidence of Mr. Buckalew, wherein he states as follows:

"Now, the theory I arrived at is this: that some explosive matter under the house was ignited by this man Hout throwing an axe under the house, and I examined everything carefully under the house that might cause an explosion. The dust, I took into consideration, and the paint cans, I took them into consideration, and the possibility of gas in the cistern. It is known to me as fire marshal that cistern gases, sometimes called sewer gases, or marsh gases, stay in abandoned cisterns. The fire department has been called on several times to put out fires on top of the ground that came from cistern gas, and my theory was that something caused that explosion, because the explosion was there, and this old man said that he threw an axe under there, and a few seconds thereafter an explosion occurred, and I just theorized that the gas from the cistern, or from some source, had been ignited by the spark from this axe."

If there had been a stick of dynamite left under the house, or nitroglycerine, or any other explosive, the axe could have been pushed or thrown against it as well, causing the explosion, according to the evidence of Mr. Buckalew. However, as above stated, if it be conceded that there was some evidence, competent in itself, to warrant the inference that the explosion was the result of the formation of gases in the old cistern, we are of the opinion that in the absence of any proof or any facts that would have put the defendant upon notice that there was an old cistern under the house, we do not think there could be any recovery. In Hines v. Wilcox, 96 Tenn., 148, 33 S. W., 914, it is said:

"We think the great weight of authority is that, if a landlord leased premises which are, at the time, in an unsafe and dangerous condition, he would be liable to his tenant for damages that may result, if he knows this fact and conceals it, or if by reasonable care and diligence, he could have known of

such dangerous and unsafe condition, and provided reasonable care and diligence is exercised by the tenant on his part."

We have examined all the assignments of error, and the questions made thereunder. The assignment directed to the action of the court in not permitting the expert testimony complained of under the assignment, must be overruled, for two reasons, first, the evidence complained of, or what the witness would have testified to is not set out under the assignment of error, and hence does not comply with the rules of this court. Second, in the view of the case we have taken it was immaterial, since if he had answered the hypothetical question by stating that the conditions referred to would cause the accumulation of gases in the cistern, could not aid the plaintiffs, since the existence of the cistern is not shown to have been known to the defendant, nor is it shown that by ordinary diligence he would have discovered its existence.

It follows that the assignments of error are overruled. Appellants will pay the cost of this appeal; the appeal is in forma pauperis.

Heiskell and Owen, JJ., concur.